UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


ALMIGHTY SUPREME BORN ALLAH,
        Plaintiff,

     v.                              Case No. 3:11CV668(SRU)

LYNN MILLING, et al.,
        Defendants.


**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

     Plaintiff Almighty Supreme Born Allah ("Allah") was incarcerated at Garner

Correctional Institution ("Garner") when he commenced this civil rights action *pro se* pursuant

to 28 U.S.C. § 1915.  Allah's complaint names Director of Offender Classification and

Population Management Lynn Milling, Counselor Supervisor Griggs, Warden Quiros, Captain

Cahill, Deputy Wardens Powers and Faucher, District Administrator Michael Lajoie and Deputy

Commissioner Dzurenda as defendants.  Allah is now living in New Britain, Connecticut.

     On August 16, 2011, the court dismissed the claims for monetary damages against all

defendants in their official capacities.  The court concluded that the Fourteenth Amendment Due

Process claims and the Eighth Amendment conditions of confinement claims should proceed

against the defendants in their individual capacities.  The defendants have moved for summary

judgment on some of the remaining claims against them.  For the reasons that follow, the

defendants' motion is denied.

**I.**     **Standard of Review**

     With a motion for summary judgment, the burden is on the moving party to establish that

there are no genuine issues of material fact in dispute and that it is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The moving party may satisfy this burden by demonstrating the lack of evidence to support the

nonmoving party's case.  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per

curiam).

 "Summary judgment is appropriate where, construing all evidence in the light most

favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law," Fed. R. Civ. P. 56(c)(2).  An issue of fact is "material" if it "might affect the outcome of

the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict

for the nonmoving party" based on it.  *Anderson*, 477 U.S. at 248. "Unsupported allegations do

not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

 When a motion for summary judgment is supported by documentary evidence and sworn

affidavits, the nonmoving party must do more than vaguely assert the existence of some

unspecified disputed material facts or present mere speculation or conjecture.  *See Western*

*World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (quotations and citations

omitted).  The mere of existence of a scintilla of evidence in support of the nonmoving party's

position is insufficient; there must be evidence sufficient to permit the jury to reasonably find for

him.  *See Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).  If there is any

evidence in the record from which a reasonable factual inference could be drawn in favor of the

opposing party on the issue on which summary judgment is sought, summary judgment is

improper.  *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83

(2d Cir. 2004).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II.   Facts[1]

In December 2009, Allah was incarcerated at Carl Robinson Correctional Institution ("Carl Robinson"), which is an open dormitory-style correctional facility. Allah was confined in Dormitory Five. There were approximately eighty inmates in Allah's dormitory who were supervised by two correctional officers. There were no cells in the dormitory. Prison officials at Carl Robinson considered any demonstration involving several inmates uniting to challenge staff conduct as a potentially dangerous situation. Past mass demonstrations by inmates at Carl

---

[1]   The facts are taken from defendants' Local Rule 56(a)1 Statement [Doc. No. 35-1], the Affidavits and Exhibits attached to the Local Rule 56(a)1 Statement [Docs. Nos. 35-2 to 35-5, 35-7], the plaintiff's Complaint and attached Exhibits [Doc. No. 1] and the Exhibits attached to Pl.'s Brief Opp'n Mot. Summ. J. [Docs. Nos. 44-1 to 44-5]. Although plaintiff has not submitted an affidavit to support his claims and oppose defendants' motion for summary judgment, the contents of his Complaint are sworn to under the penalty of perjury and thus constitute the equivalent of an affidavit for purposes of defendants' summary judgment motion. *See Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (citing *Pfeil v. Rogers*, 757 F.2d 850, 859 & n.15 (7th Cir. 1985) (noting that documents sworn under penalty of perjury may suffice for summary judgment purposes even if they do not meet all of the formal requirements of a notarized affidavit), *cert. denied*, 475 U.S. 1107 (1986)).

Rule 56(a)2, D. Conn. L. Civ. R. requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement that contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. In addition, the opposing party must submit a list of disputed factual issues. *See* D. Conn. L. Civ. R. 56(a)2 & 56(a)3. With their motion for summary judgment, defendants filed a Notice to Pro Se Litigant [Doc. No. 36] informing plaintiff of his obligation to respond to the motion for summary judgment, the time limit for filing his response, and of the contents of a proper response.

Plaintiff has responded to the motion for summary judgment, but has failed to file a Local Rule 56(a)2 Statement. Accordingly, defendants' facts are deemed admitted. *See* Rule 56(a)1, D. Conn. L. Civ. R. ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a)2.").

Robinson have led to violent situations during which inmates and prison staff were seriously injured or killed.

During the holiday season every fall and winter, correctional officials at Carl Robinson permit inmates who are not on restrictive status to visit the commissary to purchase items, including food and cosmetic products, that may not be offered for sale during the rest of the year. A "holiday package" consists of an inmate's opportunity to go to the commissary to purchase the items that are only available during the holidays.

On December 22, 2009, Allah was standing with approximately fifty other inmates in Dormitory Five around the control station awaiting distribution of the holiday packages. Another thirty inmates were in other parts of Dormitory Five.

Allah was upset because Carl Robinson prison officials were going to permit inmates in Dormitory Six to go to the commissary to purchase their holiday items before the inmates in Dormitory Five. Allah asked the correctional officer in the control station if he could speak to a lieutenant about the situation. There were only two correctional officers in Dormitory Five at the time. One of the correctional officers perceived the request to talk to a lieutenant as an attempt to incite other inmates to unite and protest the delay in the delivery of the holiday packages. The correctional officer summoned additional prison officials to Dormitory Five. A lieutenant responded to the building with other prison staff and canines. At that time, Allah and the other inmates proceeded back to their bunks in the dormitory. Allah received a disciplinary report for Impeding Order. He later pleaded guilty to the charge.

Prison officials subsequently held a hearing to determine if Allah should be sent to the Administrative Segregation Program at Northern Correctional Institution ("Northern") due to his

conduct in connection with the distribution of holiday packages.  After the hearing, prison officials decided to send Allah to Northern to complete the three-phase Administrative Segregation Program.

On March 25, 2010, prison officials discharged Allah from the custody of the Department of Correction.  He had completed approximately three months of Phase I of the Administrative Segregation Program at Northern before his release from prison.   State of Connecticut Department of Correction Administrative Directive 9.4(17)(A), in effect at the time of the plaintiff's discharge, provided that, if an inmate was discharged from custody while in the Administrative Segregation Program, upon readmission to the Department of Correction, he would be placed on administrative detention pending a determination whether he should be placed back into the Administrative Segregation Program.

On September 10, 2010, New Britain police officers arrested Allah on criminal charges.  On September 13, 2010, police officials transferred Allah to Hartford Correctional Center and prison officials recommitted him to the custody of the Commissioner of the Department of Correction.

On September 17, 2010, prison officials transferred Allah to Northern and placed him on administrative detention pending a hearing to determine whether he should be placed into the Administrative Segregation Program.  On September 27, 2010, prison officials notified Allah of the basis and date of the hearing.  On September 30, 2010, defendant Griggs presided over a hearing during which Allah testified that he had been in Phase I of the Administrative Segregation Program at the time of his discharge in March 2010.  On October 4, 2010, defendant Griggs recommended and defendant Milling authorized Allah's placement in the Administrative

Segregation Program to enable him to complete the program.  On December 1, 2010, defendant Dzurenda denied Allah's appeal of the decision to place him in the Administrative Segregation Program.

On September 26, 2011, in the Connecticut Superior Court for the Judicial District of Hartford at New Britain, Allah pleaded guilty to one count of possession of narcotics with intent to sell in violation of Connecticut General Statutes § 21a-277(a) and one count of violation of probation in violation of Connecticut General Statutes § 53a-32.  A judge sentenced him to twenty-five months of imprisonment and a Special Parole term of three years.

Inmates are placed into the Administrative Segregation Program when prison officials determine that they can no longer be safely managed in the general population because their behavior poses a threat to the security of the facility or a risk to the safety of prison staff or other inmates.   Thus, the purpose of administrative segregation is to maintain the safety and security of the Connecticut prison system.   Administrative segregation provides a secure environment where disruptive inmates can learn the necessary coping skills to permit their safe return to the general population.

The complete three-phase Administrative Segregation Program is designed to last for a minimum of ten months.  Phase I of the Administrative Segregation Program lasts for a minimum of 120 days.  The plaintiff officially began Phase I of the Administrative Segregation Program on October 4, 2010.  At Northern, all inmates in Phase I are handcuffed and placed in leg shackles whenever they leave their cells.  This requirement is for the protection of other inmates and prison staff.

Inmates in Phase I are permitted to shower at least three times a week.  After a

6

correctional officer escorts a Phase I inmate to a shower stall and secures him in the stall, the officer removes the inmate's handcuffs through a slot in the shower door. The inmate's leg shackles are not removed because there is no trap door for their removal. There is an adequate length of chain between each leg shackle to permit an inmate to wash himself in the shower.

When an inmate progresses to Phase II, neither leg shackles nor handcuffs are required when he showers. On December 13, 2010, prison officials determined that the plaintiff could progress to Phase II of the Administrative Segregation Program. On December 27, 2010, Allah refused to progress to Phase II. As a result, on January 18, 2011, Captain Cahill informed Allah that he would have to spend four more months in Phase I.

On December 28, 2010, Dr. Wright examined Allah in response to his claims that he had sustained an injury to his right knee while playing basketball or football. Dr. Wright noted that the two major tendons in the plaintiff's knee were intact. An x-ray of Allah's right knee revealed no condition that might prevent him from showering with leg shackles on.

An inmate in Phase I of the Administrative Segregation Program who is confined in either the 1 East or 1 West housing unit recreates with his cellmate in an individual recreation area. Once prison officials secure the inmates in the recreational area, they remove the inmates' handcuffs and leg shackles. Allah was housed in a cell in 1 West housing unit from September 17, 2010 to November 23, 2010. On November 24, 2010, prison officials transferred Allah to a cell in 1 East housing unit. During his time in 1 West and 1 East housing units, Allah recreated in an individual recreation area without handcuffs or leg shackles.

When the 1 East and 1 West housing units are at capacity, Phase I inmates are housed in the 3 East housing unit. The 3 East unit does not have individual recreation areas for inmates.

Typically, eight or more Phase I inmates go into the 3 East unit yard to recreate together.   Due

to safety concerns, Phase I inmates must recreate in the 3 East unit yard in handcuffs and leg

shackles.  On January 27, 2011, prison officials transferred Allah to the 3 East unit.  During his

three-month confinement in that unit, he recreated with handcuffs and leg shackles on.

On April 27, 2011, Allah agreed to progress to Phase II.  For the first thirty days of his

confinement in the Phase II unit, he recreated with a larger group of inmates in handcuffs behind

his back.  At the expiration of the thirty day period, prison officials permitted Allah to recreate

without any restraints.  The purpose of this policy is to safely reintegrate inmates into close

contact with other inmates on a gradual basis.

On November 3, 2011, prison officials at Northern transferred Allah to Cheshire

Correctional Institution.  On May 30, 2012, prison officials released Allah to supervised parole.

**III.**   **Discussion**

The defendants include four arguments in support of their motion for summary judgment.

They contend that: (1) they did not violate the plaintiff's substantive due process rights by

placing him back into administrative segregation in October 2010; (2) they did not violate the

plaintiff's substantive due process rights when they required him to wear restraints when he was

out of his cell, including times when he was in the shower and at recreation; (3) they did not

violate the plaintiff's procedural due process rights when they returned him to administrative

segregation; and (4) they are entitled to qualified immunity.

**A.**   **Substantive Due Process - Placement in Administrative Segregation**

Allah contends that defendants Milling, Griggs and Dzurenda deprived him of

substantive due process when, upon his readmission to the Department of Correction, they

transferred him to the Administrative Segregation Program at Northern as a result of an event that occurred before he was discharged from a prior term of incarceration.   He argues that as a pretrial detainee, he had a substantive right not to be housed under conditions of confinement that constitute punishment.   The defendants argue that Allah's placement in administrative segregation upon his readmission to the Department of Correction was due to legitimate safety and security concerns and was not punitive.

The parties do not dispute that Allah was a pretrial detainee in September 2010, and did not become a convicted inmate until September 26, 2011.   The claims of a pretrial detainee confined in a state correctional facility are reviewed under the Due Process Clause of the Fourteenth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979).   The Supreme Court has held that because "[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime," the Due Process clause of the Fourteenth Amendment dictates that he or she may not be punished in any manner– neither cruelly and unusually nor otherwise. *Id.* at 536-37.

"Not every disability imposed during pretrial detention," however, "amounts to 'punishment' in the constitutional sense."  *Id.* at 537.   In the absence of an allegation that "the defendant verbally expressed an intent to punish, punitive intent may be inferred from the nature of the conditions or restraints."  *Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 338 (E.D.N.Y. 2013). A court may consider "'whether an alternative purpose to which [the condition] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'"  *Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).   Thus, "if a particular condition or restriction of pretrial detention is

reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539.  If, however, a restriction or condition is "arbitrary or purposeless– a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.*  Ensuring a detainee's presence at trial, maintaining security and order within the prison facility and operating the facility in a manageable fashion are all examples of valid governmental objectives that could justify the imposition of restrictive conditions of confinement on pretrial detainees.  *See id.* at 540.  Courts "ordinarily defer to [the] expert judgment" of prison officials "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response" to administrative considerations.  *Id.* at 540 n.23.

The defendants contend that they did not intend to punish Allah by placing him in administrative segregation upon his readmission in September 2010.  Rather, his placement was ordered to ensure that he completed the three-phase Administrative Segregation Program "for the reasons for which it was designed and in accordance with his initial transfer into" the program prior to his discharge from prison and his readmission in September 2010.  *See* Defs.' Mem. Supp. Mot. Summ. J. 12.

It is undisputed that on December 22, 2009, Allah was upset about the delay in distribution of holiday packages in Dormitory Five at Carl Robinson and asked to speak with a lieutenant about the delay.  That conduct was perceived as an attempt to unite inmates against prison staff.   A correctional officer summoned additional staff to report to Dormitory Five.  Upon the arrival of additional prison staff and canines, the inmates dispersed to their bunks.  A prison official charged Allah with being the ringleader in an organized disruption of unit

operations, partaking in an unauthorized assembly and engaging in disorderly conduct which severely interfered with the units' normal operations.  The formal charge was Impeding Order.

Later that day, prison officials at Carl Robinson transferred Allah to Northern.  On December 23, 2009, during a disciplinary hearing, Allah pleaded guilty to the charge of Impeding Order and a disciplinary hearing officer imposed sanctions, including confinement in punitive segregation and loss of telephone and visiting privileges for thirty days.   Prison officials subsequently reached a decision that Allah should be placed in the Administrative Segregation  Program at Northern.

Without evidentiary support, the defendants argue that Allah was placed in the Administrative Segregation Program at Northern in December 2009 in order to maintain the normal operation of correctional facilities and to provide Allah with an opportunity to learn skills that would prevent him from resorting to similar behavior in the future.   The defendants have not submitted any documentation of the decision to place the plaintiff in administrative segregation in December 2009.  Thus, the court cannot discern the basis for the decision.

The defendants contend that, upon his readmission to the Department of Correction as a pretrial detainee in September 2010, Warden Maldonado informed defendant Milling that Allah had not completed the Administrative Segregation Program prior to his discharge in March 2010, and recommended that Allah return to Phase I of the Administrative Segregation Program at Northern because of safety and security reasons.  *See* Dzurenda Aff. ¶ 39.  These statements in defendant Dzurenda's Affidavit, however, are hearsay because he is attesting to what Warden Maldonado allegedly said to defendant Milling regarding Allah's reassignment to administrative segregation in September 2010.   Neither defendant Milling, nor Warden Maldonado have

submitted affidavits in support of the motion for summary judgment.

On October 4, 2010, after a hearing, defendant Griggs recommended that Allah be continued in the Administrative Segregation Program because he did not complete the program prior to being discharged in March 2010.   Defendant Griggs listed a September 14, 2010 memorandum from Warden Maldonado to defendant Milling as information that he relied on in making his recommendation.  *See* Compl., Ex. A at 14-15.  Neither the defendants nor the plaintiff have submitted that memorandum to the court.  Defendant Milling authorized Allah's placement in administrative segregation because he had not completed the program prior to his release in March 2010.  *See id.*   Defendant Milling's reason for authorizing Allah's placement in administrative segregation is listed as  - "continue in A.S. program."  *See id.*

Allah appealed the decision to readmit him to the Administrative Segregation Program at Northern.  On December 1, 2010, defendant Dzurenda denied the appeal on the ground that the Department of Correction's Classification Manual required any inmate discharged from prison prior to completing the Administrative Segregation Program to be placed back into the Administrative Segregation Program upon readmission to the Department of Correction.

The defendants contend that the purpose behind the plaintiff's placement in administrative segregation in October 2010 was to maintain the integrity of the Department's administrative segregation programming and to attempt to maintain the safe and orderly operation of all of the Department of Correction's facilities by ensuring that inmates who needed administrative segregation programming completed all phases of the programming before returning to the general population.   This conclusory statement is unsupported by any admissible evidence filed in support of the motion for summary judgment.  Furthermore, the

12

defendants have failed to provide information regarding the basis for Allah's initial placement in the Administrative Segregation Program in December 2009.  Nor have they provided any evidence about the basis for the requirement that pretrial detainees who have previously been discharged from the Department of Correction without having completed the three-phase Administrative Segregation Program be immediately confined in administrative detention and then sent back to administrative segregation to complete the three-phase program.

Thus, the defendants have not met their burden of demonstrating that the decision to place the plaintiff back into the three-phase program at Northern in October 2010 was made for a legitimate penological reason, such as the safety and security of other inmates or prison staff. There is a genuine issue of material fact whether the decision by defendants Griggs, Milling and Dzurenda to place the plaintiff in the Administrative Segregation Program at Northern in October 2010 was for a punitive purpose or was based on a legitimate non-punitive purpose such as effective prison management or maintaining order within the prison or ensuring the safety and security of inmates and prison staff.   The motion for summary judgment is denied with respect to the claim that the plaintiff's placement in administrative segregation in October 2010, following his readmission to the Department of Correction, violated his substantive due process rights.

### B.        Substantive Due Process - Use of Restraints

Allah alleges that during his confinement in Phase I of the Administrative Segregation Program from October 4, 2010 to April 26, 2011, prison directives or rules required that he be restrained in leg shackles at all times when he was out of his cell, except during recreation. During this time period, Allah was forced to wear leg irons while he showered.   On January 27,

2011, prison officials at Northern transferred him to the 3 East housing unit.  From that date until

April 26, 2011, prison officials required the plaintiff to recreate in the 3 East housing unit

recreation yard in handcuffs and leg irons.  The plaintiff claims that the shackles caused him pain

and it was difficult for him to maneuver and recreate with them on.   The plaintiff contends that

these conditions of confinement constituted punishment in violation of the Due Process Clause

of the Fourteenth Amendment.

The "constitutional standard by which the legality of conditions of confinement for

pretrial detainees is to be measured . . . is whether the conditions amount to 'punishment'

without due process in violation of the Fourteenth Amendment."  *Lareau v. Manson*, 651 F.2d

96, 102 (2d Cir. 1981) (quoting *Bell*, 441 U.S. at 535).   As stated above, where a prison official

does not expressly indicate that a restriction or condition is meant to be punishment, a court may

infer punitive intent from the nature of the conditions or restrictions.  The court may consider

whether the condition or restriction was excessive in relation to its non-punitive purpose or was

employed to achieve objectives that could be accomplished by alternative methods that were less

harsh or onerous.   *See Bell*, 441 U.S. at 538-39.

The defendants contend that inmates in Phase I are required to be restrained in handcuffs

and leg shackles every time they leave their cells in the interest of protecting both prison staff

and other inmates.  This requirement is due to the fact that inmates assigned to Phase I have

demonstrated by their behavior that they have the capacity to subject staff and others to potential

harm or danger.  *See* Defs.' Mem. Supp. Mot. Summ. J., Cahill Aff. ¶¶ 13-14.

Allah was permitted to shower without handcuffs on because there were slots in the

shower doors to permit the removal of his handcuffs after he was securely confined in the

14

shower stall.   Because there were no slots in the shower doors to permit correctional staff to take

off Allah's leg shackles, he was required to shower with leg restraints on.

With regard to the requirement that Allah recreate in handcuffs and leg irons during his

confinement in Phase I from January 27, 2011 to April 26, 2011, the defendants indicate that the

3 East housing unit did not have individual recreation yards.   Thus, approximately eight or more

Phase I inmates would go out into one recreation area together.   From experience, prison

officials at Northern were aware that Phase I inmates could be dangerous, unpredictable and

disruptive.   Because of the significant potential for inmate-on-inmate violence if unrestrained

Phase I inmates were permitted to recreate together, prison officials required inmates in the 3

East housing unit yard to recreate in handcuffs and leg shackles.   *See* Defs.' Mem. Supp. Mot.

Summ. J., Cahill Aff. ¶¶ 21-26.

The defendants argue that these restraint policies are not punitive, but instead meet the

legitimate penological objectives of institutional security and the safety of inmates and staff.

This argument is based on the assumption that Allah's initial placement in Phase I of the

Administrative Segregation Program did not constitute punishment.   As indicated above, a

genuine issue of material fact exists concerning the basis for Allah's placement in the

Administrative Segregation Program upon his re-admission to the Department of Correction as a

pretrial detainee.   Accordingly, there are also issues of material fact whether any restrictions

imposed upon the plaintiff during his confinement in Phase I constituted punishment.   The

motion for summary judgment is denied with respect to the claims relating to the conditions of

confinement in Phase I of the Administrative Segregation Program requiring Allah to wear

handcuffs and restraints when outside of his cell, in the shower and while recreating in the 3 East

housing unit recreation yard.[2]

### C.      **Procedural Due Process**

Allah challenges the procedures used by the defendants to place him in the Administrative Segregation Program at Northern.  In analyzing this claim, the court must first determine whether the alleged deprivation is punishment that would implicate the Due Process Clause.  If so, the court must then determine what process is due.   The defendants contend that the plaintiff's placement in the Administrative Segregation Program did not constitute punishment.   Thus, they argue that the standard set forth in *Hewitt v. Helms*, 459 U.S. 460 (1983), governs the plaintiff's procedural due process claims.

Under *Hewitt*, an inmate placed in administrative confinement is entitled to "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation" in an informal, non-adversary proceeding held "within a reasonable time following his transfer" to administrative confinement.  *Id.* at 472.  If the purpose of more restrictive confinement is disciplinary or punitive, the law requires advance written notice of violations, adequate time to prepare a defense,  a limited ability to present witnesses and evidence and a written statement documenting evidence relied upon and reasons for the action taken.  *See Wolff v. McDonnell*, 418 U.S. 539, 563-68 (1974).

As noted above, there is a genuine issue of material fact regarding whether the plaintiff's re-assignment to administrative segregation in October 2010 constituted punishment.  The

---

[2]   The Complaint also includes allegations that on January 22, 2011, his leg shackles became tangled while he was showering and caused him to fall and hit his head.  The plaintiff claims that he suffered injuries to his head, neck and lower back due to the fall.  The defendants do not address these separate claims of deliberate indifference to his safety or medical needs.

defendants' argument relies solely on the procedural due process to be afforded an inmate who is placed in administrative segregation and assumes the placement in administrative segregation was for non-punitive reasons.  Because the defendants have not sufficiently addressed what process might be due when a pretrial detainee is placed in an Administrative Segregation Program as punishment, the motion for summary judgment is denied with respect to the procedural due process claim.

> **D.**   **Qualified Immunity**

The defendants argue that, even if Allah has presented sufficient evidence to support a finding that the decision to place him in administrative segregation following his readmission to the Department of Correction in September 2010 was punitive, they are entitled to qualified immunity.  The defendants have the burden of proving the affirmative defense of qualified immunity in a motion for summary judgment or at trial.  *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine if an official is entitled to qualified immunity, the court determines (1) if the facts alleged or shown by the plaintiff state a violation of a constitutional right, and (2) if the right is clearly established so that a reasonable official would have known that his conduct was unlawful.  *See Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2080 (2011).  A negative answer to either question means that immunity from monetary damages claims is appropriate.  *Pearson*, 555 U.S. at 236.  The

Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to decide first in view of the particular circumstances surrounding the case to be decided.  *See id.*

Under the second prong, a right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.'" *al-Kidd*, 563 U.S. at ___, 131 S. Ct. at 2078 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  "A broad general proposition" does not constitute a clearly established right.  *See Reichle v. Howards*, 566 U.S. ___, ___, 132 S. Ct. 2088, 2094 (2012).  Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson*, 483 U.S. at 640).

At the time of Allah's placement in administrative segregation, it was clearly established that purposeless restrictions or conditions of confinement can constitute impermissible punishment when imposed on pretrial detainees.  *See Bell*, 441 U.S. at 535 ("[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment."); *Benjamin v. Fraser*, 343 F.3d 35, 50 (2d Cir. 2003) ("[U]nder the Due Process Clause, [a pretrial detainee] may not be punished in any manner– neither cruelly and unusually or otherwise. . . . Accordingly, courts considering challenges by pretrial detainees must initially consider whether the challenged conditions are punitive." (citations omitted)).

18

The defendants argue that given the existence of State of Connecticut Administrative Directive 9.4(17), which required the plaintiff's placement in administrative segregation because he had not previously completed the phase program prior to his readmission, a reasonable officer would not consider the decision to place the plaintiff in administrative segregation after a hearing to have been unlawful.  The defendants mischaracterize this section of Administrative Directive 9.4.  It does not require the automatic placement of an inmate in administrative segregation after that inmate has been readmitted to the Department of Correction.  Rather, it requires the Unit Administrator and Director or Offender Classification and Population Management to review the inmate's status upon readmission and make a recommendation either to continue the inmate in the Administrative Segregation Program or terminate the inmate from the program and makes no reference to the designation of pretrial detainees to administrative segregation.

There is a genuine issue of material fact whether the defendants intended to punish the plaintiff by placing him in administrative segregation pursuant to Administrative Directive 9.4(17)(A), because the basis for the decision to continue the plaintiff in administrative segregation is unclear.   That issue of fact precludes a determination that it was reasonable for an officer to believe that placing the plaintiff in administrative segregation after his readmission to the Department of Correction pursuant to Administrative Directive 9.4(17) was lawful.  In view of the holding in *Bell* regarding the prohibition against the imposition of purposeless restrictions on pretrial detainees, it is impossible to conclude that a reasonable officer could believe that placing a pretrial detainee in administrative segregation and subjecting him to restrictive conditions of confinement, including handcuffs and leg shackles, as if he were a convicted inmate would be lawful.

19

Thus, genuine issues of material fact preclude a determination that the defendants are entitled to qualified immunity.  *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity is not appropriate when there are facts in dispute that are material to determination of reasonableness.");  *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996) (holding that matter of officers' qualified immunity could not be resolved as a matter of law because determination whether it was reasonable for officers to believe their actions met established legal principles depended on disputed version of facts); *Maye v. Vargas*, 638 F. Supp. 2d 256, 261-62 (D. Conn. 2009) ("Although qualified immunity is a question of law, because issue [sic] of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted." (citation omitted)).  Accordingly, the defendants are not entitled to summary judgment on the basis of qualified immunity.

## IV.   **Conclusion**

The defendants' Motion for Summary Judgment [**Doc. No. 35**] is **DENIED** in all respects regarding the claims of procedural due process and the claims of substantive due process relating to the plaintiff's placement in the Administrative Segregation Program in October 2010 and the conditions under which the plaintiff was confined in administrative segregation, including the requirements that he wear handcuffs and leg restraints when outside of his cell, in the shower and while recreating in the 3 East housing unit recreation yard.  Because the defendants did not move for summary judgment with respect to the plaintiff's conditions of confinement claims that the defendants denied him telephone calls, visitation privileges and access to courts, and were deliberately indifferent to his safety and/or medical needs in connection with his fall in the

shower in January 2011, those claims will proceed as well.

      **SO ORDERED** this 19th day of November, 2013, at Bridgeport, Connecticut.

                                   /s/ Stefan R. Underhill
                                 Stefan R. Underhill
                                 United States District Judge