UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALMIGHTY SUPREME BORN ALLAH,

    Plaintiff,

         vs.                   No. 3:11cv668(WIG)

LYNN MILLING, et al.

    Defendants.
_____X


## **RULING**

    Plaintiff Almighty Supreme Born Allah ("Allah") brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that defendants violated his Fourteenth Amendment rights to substantive and procedural due process by confining him to Administrative Segregation as a pretrial detainee. Allah's constitutional claims arise out of the defendants' decision to return him to Administrative Segregation after he had been released from a prior term of incarceration while on that status. During the time giving rise to Plaintiff's allegations, defendant Jason Cahill was a Shift Commander at Northern Correctional Institution ("Northern"), defendant Brian Griggs was a Supervisor in the Offender Classification and Population Management Unit, and defendant Lynn Milling was the Director of Offender Classification and Population Management.

    A bench trial was held on December 2 and 3, 2015. At trial, Plaintiff testified on his own behalf. Defendants Cahill, Griggs, and Milling also testified. The evidence adduced at trial is summarized below as necessary to explain the Court's findings and conclusions. For the reasons that follow, the Court enters judgment in favor of the plaintiff. [1]

_____

[1] Plaintiff also requests that judgment be entered in his favor against Deputy Commissioner

## FINDINGS OF FACT

Each inmate under State of Connecticut Department of Correction ("DOC") custody must be placed in a facility appropriate for that inmate's security and treatment needs.  This placement procedure is known as the classification process.  In the classification process, inmates are assigned an overall risk score of one to five, with one being the lowest security level and five being the highest.  Any inmate with an overall risk score of five will be assigned to Administrative Segregation.  State of Connecticut Department of Correction Administrative Directive ("Administrative Directive") 9.2(8)(A) requires consideration of the following factors when assessing an inmate's risk: history of escape; severity and/or violence of current offense; history of violence; length of sentence; presence of pending charges, bond amount and/or detainers; discipline history; and security risk group membership.

In determining an inmate's placement, DOC officials also consider an inmate's health needs, education needs, community resource needs, and sex offender status.  The goal of the classification process is to place inmates appropriately based upon the risk they present and their needs.

When an inmate who has been released from a prior term of incarceration re-enters DOC

---

Dzurenda.  As to Dzurenda, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted).  Personal involvement can be established by evidence showing:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  No evidence presented at trial established Dzurenda had personal involvement.  Accordingly, any claims against him are hereby dismissed.

custody as a pretrial detainee, a classification assessment is made.  When, however, a pretrial detainee was released from a prior term of incarceration with an overall risk score of five, that person will be automatically placed on Administrative Detention pending a hearing to decide whether placement in Administrative Segregation is appropriate.  In such a scenario, the risk factors enumerated in Administrative Directive 9.2(8)(A) are not considered by DOC personnel in assignment placement.

The DOC has several placement categories for inmates.  Among these are restrictive housing statuses.  Punitive Segregation, Administrative Detention, and Administrative Segregation are three types of restrictive housing statuses.  Inmates are assigned to a restrictive housing status typically because they have been determined to pose a threat to the safety and security of a general population facility.  Inmates on restrictive housing status are not permitted access to the same programs and privileges afforded to inmates in the general population.  Programs and privileges afforded to the general population include the following:  attending general population recreation including outside yard, dayroom, gymnasium, and library; attending work assignment; attending school if under twenty-one years of age; attending social visits; attending collective religious services; attending addiction services programs; using the telephone; receiving commissary; showering; attending meals with the general population; and retaining a television and/or radio in one's cell.  Further, an inmate in Administrative Segregation will not earn or receive statutory good time credit while on that status.  Inmates on restrictive housing status may earn back access to limited privileges based upon satisfactory behavior.

<u>Punitive Segregation</u> is a component of the disciplinary process; it is a consequence for an infraction committed by an inmate which results in placement in a restrictive housing unit at

any facility.  Punitive Segregation typically lasts for a short, circumscribed period of time.

Administrative Detention is also a temporary restrictive housing status: an inmate is placed in Administrative Detention after being removed from the general population and is held there pending a hearing or disciplinary disposition determining whether continued restrictive status is appropriate.

Administrative Segregation, as opposed to a brief and/or temporary placement, is a three phase program.  During the period at issue, the program was implemented at Northern, which is a maximum security prison.  Administrative Segregation is designed to remove problematic inmates from the general population, usually based on an incident that occurred while the inmate was in the general population, for safety and security reasons.  Its programming aims to provide coping and anger management skills so that inmates can return to the general population better adjusted to that setting.  In Phase I, an inmate is typically alone in his cell for twenty-three hours per day.  Phase I lasts for a minimum of four months.  There are no programming components in this phase.  Phases II and III, which each last for approximately three months, contain some programming where inmates address anger management and coping skills in a group setting. The program becomes less restrictive as inmates are offered more privileges and opportunities as they successfully progress through it.  While an inmate is in Administrative Segregation, he is reviewed for progression through the program, which is contingent upon successful completion of the prior phase.

The DOC has delineated provisions and management standards for the restrictive housing statuses.  These standards do not differentiate between pretrial detainees and post-conviction prisoners.  An inmate in Punitive Segregation or Administrative Detention is required to be handcuffed behind the back before being removed from his cell, except when making a

telephone call, at which time he is handcuffed in the front.  The inmate must be escorted on a one staff, one inmate basis when out of his cell.  Inmates on these two statuses are entitled to a minimum of three fifteen-minute showers per week.  They may have work assignments, but are limited to cleaning and food service assignments in the housing unit.  Meals are eaten inside their cell.  Recreation is allowed for one hour per day, five days a week, in a controlled area.  Counseling, chaplaincy, and health services will tour the unit at least once every seven days.  Visits are generally not allowed.  Inmates on these two statuses will be entitled to legal visits as needed and approved by a unit administrator.  They may send and receive mail, but may only retain five letters in their cells.  These inmates are limited to retaining two books or periodicals at a time.  Legal materials are provided upon an inmate's request to address a legal issue that requires immediate attention.  Telephone calls are not allowed unless approved by the Unit Administrator.  Finally, an inmate in Punitive Segregation or Administrative Detention is not allowed a television or radio in his cell.

As for Administrative Segregation, an inmate in **Phase I** must be handcuffed behind the back and put in leg irons before being released from his cell.  If the inmate will be making a phone call, he will be handcuffed in front and also put in leg irons.  The inmate must be escorted on a one staff, one inmate basis when out of his cell.  Inmates are entitled to three fifteen-minute showers per week.  When the inmate is in Phase I of Administrative Segregation, he is taken to the shower area in handcuffs and in leg irons; upon arrival at the secure shower area, the handcuffs are removed and the inmate must shower with the leg irons on.  Phase I inmates are not allowed to have work assignments.  Meals are eaten inside their cells.  Recreation is permitted one hour per day, five days per week.  Handcuffs are required during recreation unless the inmate is in a secure individual recreation area.  The secured recreation area at Northern is a

5

space approximately 50 x 20 feet in size, divided into three enclosures. Each enclosure is a fenced area when an inmate can recreate without restraints. There is no sporting equipment in the recreation area. Inmates are permitted to exercise in their cells. Program opportunities are provided only in-cell during Phase I, and religious and counseling programs are available on a limited basis. Inmates are allowed one thirty-minute non-contact visit per week with an immediate family member. Extended family is not allowed to visit. Non-contact visits require a physical barrier to be placed between the inmate and his visitor. Legal visits are allowed as needed and approved. Inmates may send and receive mail, but may only retain five letters in their cells. Reading materials, including legal materials, may not exceed four cubic feet of total allowable property. One fifteen-minute telephone call is permitted per week, except for legal telephone calls as approved by a supervisor or counselor. An inmate is not allowed a television, but is permitted to have a radio in his cell.

Some of these restrictions are alleviated in **Phase II** of Administrative Segregation. For example, after the inmate has been in Phase II for thirty days, restraints are not required when the inmate is transported within the unit. Inmates may have a work assignment within the unit. For recreation, handcuffs in the front are required for the first thirty days, and no restraints are required thereafter. Program opportunities are provided out of cell after the first thirty days of Phase II, but inmates remain in restraints and in a secured area. In Phase II, inmates can retain more than five letters, but their total possessions may not exceed four cubic feet. Visits and telephone calls are increased to two per week.

Restrictions are lessened further in **Phase III** of Administrative Segregation. For example, restraints are not required for movement within the unit. Meals are eaten outside of the cell but within the housing unit. No restraints are required during recreation. Program

6

opportunities are provided out of cell in a secured area, and inmates are not restrained. Telephone calls and visits are increased to three per week.

Defendant Griggs testified about the programming component of Administrative Segregation. In Phases II and III, inmates, in groups, complete several modules of a program called "Thinking for a Change," which is designed to improve anger management and coping skills. The defendants testified that the program allows the inmate to gradually interact with other Administrative Segregation inmates as he progresses through the phases with the goal of returning to the general population. According to the defendants, the integrity of the program is maintained by inmates successfully completing all three phases.

Inmates progress through the Administrative Segregation phases contingent upon successful completion of specific program components. A panel of DOC officials reviews each inmate's progress and makes a recommendation as to whether an inmate should move on to the next phase. If an inmate refuses to progress after a recommendation is made, the inmate can be issued a disciplinary report for Violation of Program Provisions. If such a disciplinary report is issued, the inmate will be retained in Phase I. There is no differentiation between a pretrial detainee and a post-conviction prisoner with respect to the consequences of accepting or rejecting progression.

According to DOC policy, all inmates who were released from incarceration while on Administrative Segregation must be placed on Administrative Detention upon readmission pending review of continuance of Administrative Segregation status within fifteen days of readmission. If continuance of Administrative Segregation is recommended, a classification hearing must be held within thirty days. Inmates cannot be placed into Administrative Segregation without notice and a hearing. Written notice of the hearing and the reasons for the

7

hearing must be provided to the inmate at least two business days prior to the hearing.  The purpose of the hearing is to consider the classification assignment to Administrative Segregation by examining "evidence to support the classification," including statements by the inmate and/or any witnesses.  Administrative Directive 9.4(12).

In December 2009, Allah was incarcerated at Carl Robinson Correctional Institution ("Carl Robinson"), which is an open campus dormitory-style facility that is medium security.  Allah was assigned to dormitory five of Carl Robinson.

On December 22, 2009, Allah was standing with approximately fifty other inmates in his dormitory around the control station awaiting their turn to visit the commissary to purchase items that are sold only during the holiday season.  Another thirty inmates were in other parts of dormitory five.  Prison officials decided to permit inmates in dormitory six to go to the commissary before the inmates in dormitory five.  Allah asked the correctional officer in the control station if he could speak to a lieutenant about this.  There were only two correctional officers in dormitory five at the time.  One of the correctional officers perceived the request to talk to a lieutenant as an attempt to incite other inmates to unite and protest the delay in visiting the commissary.  The correctional officer summoned additional staff to the dormitory.  A lieutenant responded to the building with other prison staff and dogs.  Because of a history of riots at Carl Robinson, prison officials considered any disturbance or demonstration involving several inmates to pose a serious threat to safety and security.  Past incidents had resulted in severe harm to inmates and staff.

After the December 22, 2009 incident, Allah received a disciplinary report for Impeding Order.  He pled guilty to the charge.  Prison officials held a hearing on January 19, 2010, to determine whether Allah should be sent to Administrative Segregation at Northern, and Allah

was in fact assigned to Administrative Segregation on February 11, 2010 to complete the three-phase program.[2]  Allah was discharged from DOC custody on March 25, 2010.  At that time, he had completed only three months of Phase I of Administrative Segregation.

Administrative Directive 9.4(17)(A), which was in effect at the time of Allah's discharge, provided that if an inmate was discharged from custody while in the Administrative Segregation Program, upon readmission to the Department of Correction, he would be placed on Administrative Detention pending a determination whether he should be placed back into the Administrative Segregation program.

On September 10, 2010, New Britain police officers arrested Allah.  On September 13, 2010, Allah was returned to DOC custody at Hartford Correctional Center as a pretrial detainee. Allah was immediately placed on Administrative Detention.  The Restrictive Housing Unit Status Order for Allah, dated September 13, 2010, states the reason for the Administrative Detention placement as follows: "The inmate s/my (sic) continued placement in the general population poses a serious threat to life, property, self, other inmates, and/or the security of the facility because: Inmate Allah was place (sic) on Administrative Detention pending Transfer: Overall Level 5."  The defendants testified that Allah was placed on Administrative Detention because he entered the system with an overall risk level of five.  Placement on Administrative Detention allows DOC officials to separate a re-admitted inmate from the general population until they have an opportunity to determine whether Administrative Segregation should be continued.  The Office of Offender Classification and Population Management will continue Administrative Segregation placement when a pretrial detainee had been discharged from a

_____

[2] The plaintiff is not challenging the 2009 incident and the classification process in January and February of 2010.  This information is provided as relevant background to his challenge to the events occurring in September and October of 2010 when Allah was a pretrial detainee.

previous term of incarceration while on Administrative Segregation status.  There are two possible exceptions: if the inmate was close to completing the third and final phase of Administrative Segregation during the prior incarceration, or had been discharged from DOC custody more than five years before, a pretrial detainee might not be continued in Administrative Segregation.

On September 17, 2010, DOC officials transferred Allah to Northern on Administrative Detention pending a hearing to determine whether to place him in Administrative Segregation. Allah was notified of the hearing on September 23, 2010.  The notice listed the reason for the hearing as follows:  "You were placed on A/S on 02/08/10.  Since that time you discharged and returned to the DOC without completing the program."  The notice informed Allah that he could choose a staff advocate and request relevant and non-redundant witness statements.

Allah chose Correctional Counselor Tourangeau as his advocate.  Correctional Counselor Tourangeau completed an Advocate Investigation Report on September 24, 2010.  On the report, he wrote that "inmate will bring a written statement to the scheduled hearing."  The remainder of the report, which has sections for "Inmate Witness(s) Statements(s)," "Staff Witness(es) Testimony," and "Advocate's Conclusion and Recommendation," was blank.

The hearing was held on September 30, 2010.  Notes on the Hearing Record form state "[s]ee enclosed advocate statement, I was in Phase One."  Prison officials present at the hearing were defendant Griggs, who was the hearing officer, and Correctional Counselor Miller, who was the recording officer.  Correctional Counselor Miller is listed as the Inmate Advocate.  At the hearing, defendant Griggs explained the appeals process in depth, and noted that Allah was being reviewed for Administrative Segregation because he had been discharged on that status.

On October 4, 2010, defendant Griggs completed a Restrictive Status Report of Hearing

10

for Placement or Removal in which he recommended Allah's placement in Administrative Segregation. The summary of the placement rationale stated: "According to the DOC Classification Manual, any inmate who discharges while on Administrative Segregation (A/S) shall be re-admitted at that status. I/M/ Allah was placed on A/S on 02/08/10. Since that time he discharged and returned to the DOC without completing the program." The stated reason for the recommendation was: "Inmate Allah did not complete the program, (sic) therefore he needs to continue in Administrative Segregation placement to complete program requirements prior to being placed in the general population." Defendant Milling authorized the placement that same day, and Allah, as a pretrial detainee, officially began Phase I of the program.

Defendants Griggs and Milling testified that they had reviewed the placement and hearing paperwork from the fall of 2010, as well as the paperwork relating to the December 2009 incident at Carl Robinson, when making the classification determination in October 2010. The defendants testified that nothing Allah had done in DOC custody since his new arrest in 2010 would have warranted placement in Administrative Segregation in and of itself. The charges pending against Allah in 2010 were not considered. Allah's status as a pretrial detainee was also not considered by defendants Griggs or Milling in making their decision to place him in Administrative Segregation.

After Allah was placed in Administrative Segregation on October 4, 2010, he was alone in a cell for approximately twenty-three hours a day for his stay in Phase I. He was not provided with any in-cell programing during the first phase. An inmate in Phase I must be handcuffed and placed in leg irons when out of his cell, including when going to shower. Because inmates cannot walk to the shower completely undressed, and because his leg irons were not removed upon arrival at the shower area, Allah was required to shower in his boxer shorts and walk back

11

to his cell wearing the wet garment.  On January 22, 2011, Allah fell while showering when his

leg irons got caught in the rubber carpeting in the shower area.  Allah testified that he hit his

head during this fall.  After being examined by medical staff, he was returned to his cell.

Allah did not have access to a law library while in Phase I as a pretrial detainee.  While

he was able to request copies of certain materials and request legal calls, he was unable to do

independent legal research.  Allah testified that his time in Administrative Segregation as a

pretrial detainee put strain on his relationship with his family because it was difficult for his wife

to make the trip to see him at Northern and he did not want his four-year-old daughter to visit

because she would have seen him in shackles.  He testified that when he had been housed in the

general population during other periods of incarceration he was able to visit with his family more

often, some contact was allowed, and the visits were not in a setting such as Northern, where the

most serious offenders in the state are housed.

On December 13, 2010, prison officials recommended Allah progress to Phase II of

Administrative Segregation.  Allah refused to sign the progression document which delineated

the expectations of Phase II.  As a result, he remained in Phase I for another 4 months.   Allah

testified that he refused progress in the program because he felt that as a pretrial detainee he

should not be in Administrative Segregation and did not want to sign his consent to the

placement.  Allah did eventually progress to Phase II on April 27, 2011.  He relented because

Phase II would allow him one additional visit and phone call per week with his family.

Approximately four months thereafter, Allah progressed to Phase III.  Allah completed some

programming during Phases II and III.  In addition, his options for recreation were broadened

and he was able to play basketball.

On September 26, 2011, Allah pleaded guilty to the charges associated with his

September 2010 arrest. As of that date, the plaintiff became a post-conviction prisoner. Allah was transferred to Cheshire Correctional Institute on November 3, 2011, upon his completion of all three phases of Administrative Segregation. He was released from DOC custody on May 30, 2012.

Allah summarized his experience in Administrative Segregation in this way: "There's prison, and then there's Northern. It's just a whole different level." He testified that he was housed alongside "the most heinous [inmates] in the state." He was not able to have regular visits with his family and was not able to keep more than five letters in his cell. He was not able to call his family as often as he would have been able to had he been in the general population. He always rested in such a way where he could "get up immediately" if necessary to protect himself. Allah testified that he rarely slept and that he lost weight while in Administrative Segregation as a pretrial detainee. He testified to feeling paranoid, and of always being on guard and on edge. Those feelings have remained with him, even after his release.

## CONCLUSIONS OF LAW

### 1. Substantive Due Process

The plaintiff contends that his confinement in Administrative Segregation as pretrial detainee violated his constitutional right to substantive due process. The Court agrees. Allah's placement in Administrative Segregation as a pretrial detainee on October 2010 does not comport with the Due Process Clause of the Fourteenth Amendment.[3]

Allah was a pretrial detainee from his placement in DOC custody on September 13, 2010 until September 26, 2011, when he pleaded guilty to the charges associated with his September

---

[3] The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

2010 arrest.  Under the Due Process Clause of the Fourteenth Amendment, a pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  It is thus the court's role to determine whether a condition or restriction placed upon a pretrial detainee "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* (citing *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-169 (1963)).  When "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539.  In the converse, when a restriction "is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment." *Id.*  Legitimate governmental objectives include "ensuring the pretrial detainees' presence at trial, maintaining security and order within the prison facility and operating the facility in a manageable fashion." *Friedland v. Otero*, No. 3:11-cv-606(JBA), 2014 WL 1247992, at *4 (D. Conn. March 25, 2014).

Courts examine the *Mendoza-Martinez* factors in analyzing whether a condition or restriction is punitive:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions.

14

*Bell* at 537-538 (citing *Mendoza-Martinez*, 372 U.S. at 168-169).

The defendants claim that maintaining the integrity of the Administrative Segregation program by ensuring that all inmates who need the program complete it is a legitimate correctional goal.  The policy, they argue, maintains safe and orderly operations of all correctional facilities in the state.  While maintaining safety and security are generally valid governmental objectives, the restrictions placed on Allah as a pretrial detainee in this case were not reasonably related to such a purpose, and were excessive in relation to this purpose.

The conditions imposed on the plaintiff amounted to what has "historically been regarded as punishment."  During Phase I of Administrative Segregation, Allah remained alone in a cell for approximately twenty-three hours a day.  "Solitary confinement 'is itself an infamous punishment,' and 'not ... a mere unimportant regulation as to the safe-keeping of the prisoner.'"  *Levine v. Menifee*, No. 05 CIV. 1902 (RCC), 2005 WL 1384021, at *9 (S.D.N.Y. June 9, 2005) (citing *In re Medley*, 134 U.S. 160, 169 (1890)).

Other restrictions placed upon Allah are obvious forms are punishment.  He was deprived of many privileges available to inmates in the general population, including the extent to which he could use the phone and attend visits.  He was also deprived of attending general population recreation, accessing the law library, and attending meals with the general population.  These deprivations are in fact considered punishment by the DOC: Defendant Cahill testified, for example, that loss of phone and visiting privileges were punitive in nature.  DOC Administrative Directives also deem such restrictions punitive.  Under Administrative Directive 9.5(10)(D), violation of the disciplinary code warrant penalties such as loss of telephone privileges and loss or modification of social visits.  Some of the conditions to which the plaintiff was subjected in Administrative Segregation were even more severe that the restrictions applied to inmates

officially on *punitive* status.  For example, those on punitive status are not always required to wear leg irons when moving throughout the unit and are not required to shower in leg irons (and thus with an article of clothing on).  Punitive Segregation inmates may have work assignments and recreate without restraints, while inmates in Phase I of Administrative Segregation cannot.

Many of the restrictions placed on Allah were not reasonably related to the goal of safety and security.  For example, the defendants could not explain (nor can the Court) how limiting Allah, as a pretrial detainee, to having only five pieces of mail in his cell was reasonably related to a security concern.  Likewise, there appears no reason why allowing him to have a television in his cell would be a safety concern.  There was also no evidence presented as to why limiting phone calls and social visits were related to safety concerns.  When examined as a whole, the severe restrictions of Administrative Segregation, particularly those in Phase I, were simply not reasonable in this case absent an individualized finding that Allah was a threat to safety and security as a pretrial detainee in 2010.  When conditions of confinement – as these are – are arbitrary, the Court can properly infer they are punitive.  *See Bell*, 441 U.S. at 539.

Next, the conditions imposed were excessive in relation to prison officials' proffered purpose.  Such excessiveness compels a finding that the restrictions were not reasonably related to a legitimate government objective.  *See Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  The defendants testified that the 2009 incident at Carl Robinson was deemed significant in large part because it occurred at an open-dormitory facility with a history of riots.  Yet, as a pretrial detainee in the fall of 2010, the plaintiff could have (and according to defendant Milling's testimony likely would have) been housed in a jail-type facility where the risk of riots would be mitigated.  In addition, there was no evidence that the defendants made a particularized finding that the

16

plaintiff failed to understand the reason for the sanction in 2009 and was inclined to repeat his behavior, or that he would pose a threat in a jail-type setting.  In fact, testimony established that the plaintiff had exhibited no problematic behavior while in Administrative Segregation in 2009 or after his arrest and readmission in 2010.  Without any specific, individualized findings that Allah presented a risk to safety and security as a pretrial detainee, the restrictions as applied to him were excessive.

The defendants made clear that Allah's status as a pretrial detainee was not considered in deciding to place him in Administrative Segregation.  This is problematic in various ways, and particularly because all three phases of Administrative Segregation inhibit access to the law library.  While the plaintiff could have requested certain legal materials, he was not able to conduct any legal research independently.  As a pretrial detainee, Allah still enjoyed the presumption of innocence.  Preparing and participating in the preparation of his defense is critical at that stage.

The defendants' testimony, as a whole, revealed that not only was pretrial detainee status not considered, but that the defendants failed to recognize why that status is significant.  As is evident from the phrase *pretrial detainee*, such a person "has not been adjudged guilty of any crime," and is being housed by the state in a facility "the purpose of [which] is to detain."  *Bell*, 441 U.S. at 536-537.  While "[l]oss of freedom of choice and privacy are inherent incidents of confinement" in general, prison officials must recognize that a pretrial detainee cannot be subjected to restrictions and conditions amounting to punishment.  *Id.* at 537.

In all, the restrictions and conditions of Administrative Segregation smack of punishment in Allah's case.[4]  They were not reasonably related to the DOC's stated purpose, and were

---

[4] This is not to say this is true for other inmates or in all Administrative Segregation placements.

excessive in relation to that purpose.  In plain terms, the DOC was taking privileges away

because the plaintiff had not completed a previously-imposed program.  This is constitutionally

impermissible.  There was no reassessment that the plaintiff, if he ever had been a threat,

remained a threat at the time he re-entered DOC custody in September 2010, or that the

conditions and restrictions of Administrative Segregation were reasonably related to any threat.

Without any individualized or specific finding of the risk Allah may have presented in the fall of

2010, one is left to conclude that the DOC was continuing to punish him for his conduct in

December of 2009.

  While the defendants repeatedly claim that Administrative Segregation was a

"management tool" for inmates who pose a threat to safety and security to enable them to

address their behavior so that they may return to the general population, saying something

repeatedly does not make it so, at least in Allah's case.  The evidence adduced at trial belies this

claim with respect to Allah and his experience in Administrative Segregation.  There was

absolutely no programming or counseling or therapy or any sort of "management" services

provided to the plaintiff during the entire first phase of the program.  Further, despite their

insistence to the contrary, the defendants acknowledged the punitive nature of Administrative

Segregation:  Defendant Cahill testified that one goes to Administrative Segregation after one

has "done something to warrant that placement."  Likewise, defendant Griggs stated that

Administrative Segregation was to "segregate the inmate if they did something very bad."  This

characterization supports an interpretation of the program as a mechanism for punishment of

problematic inmates.  While, of course, prison officials must be able to punish or segregate or

control inmates who present a risk to the safety and security of the facility and to others, prison

officials cannot place a pretrial detainee in such a setting without a genuinely sensible reason for doing so.

There was no real determination, no individualized assessment, that Administrative Segregation was appropriate for Allah for any reason other than that he did not complete the program before. This, coupled with the admission that his pretrial detainee status was not considered, compels the conclusion that Allah was returned to Administrative Segregation because he owed the DOC time – because he never completed his punishment from before – rather than because there was a fair assessment that the restrictions of Administrative Segregation were reasonably related to a safety or security concern Allah presented as a pretrial detainee. It is also worth noting that the plaintiff's initial placement in Administrative Segregation after the 2009 incident occurred on February 8, 2010. In a memo to defendant Milling from the warden of Carl Robinson on December 23, 2009, the warden of Carl Robinson stated that the plaintiff's maximum discharge date was March 25, 2010. Prison officials knew of the imminence of Allah's release when they placed him in Administrative Segregation; thus, they knew there was no chance that he would actually complete the program. This undermines the claim that the program was a management tool and that its integrity would be compromised if an inmate did not complete all three phases. It strongly suggests that the initial placement, in Allah's case, was for punitive purposes, and perhaps to send a message to other inmates at Carl Robinson. When Allah returned to DOC custody as a pretrial detainee in 2010, the punishment was simply re-imposed.

In general, "the court is required to defer in matters of prison security to the 'professional expertise of corrections officials … in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations.'" *Dolphin v.*

*Manson*, 626 F.Supp. 229, 235-236 (D. Conn. 1986) (citing *Bell*, 441 U.S. at 540-541).  This

deference does not, however, require a court to accept blindly any explanation prison officials

offer.  Here, with little to bolster the defendants' proffered explanation, and evidence as to the

excessiveness of the conditions even in light of the proffered explanation, the Court simply

cannot accept it.  Here, there is "substantial evidence" that the defendants "exaggerated their

response" to this situation involving a pretrial detainee.  *See id.*

 The above findings are consistent with relevant caselaw.  In *Taylor v. Comm'r of New

York City Dep't of Corr.*, 317 F. App'x 80 (2d Cir. 2009), a pretrial detainee was sent to a

segregation unit after assaulting an inmate who subsequently died.  The confinement was

reasonable to protect Taylor and the prison population and "was also not excessive in relation to

the purpose of maintaining safety."  *Id.* at 82.  In *Dolphin*, 626 F. Supp. at 235, a pretrial

detainee's placement in administrative segregation was likewise "reasonably related to the

legitimate governmental objective of maintaining order and security."  Dolphin had escaped

from custody during a court appearance and then "committed several serious and violent crimes

before his recapture."  *Id.* at 232.  A second reason for Dolphin's placement in Administrative

Segregation was to protect him from other inmates who had threatened him.  *Id.*  In Allah's case,

there was no such security threat.  The restrictions imposed on him were simply not reasonably

related to the purpose of maintaining safety.  The only reason for the placement stated in DOC's

documentation is that Allah had not completed the program.  That is not enough.

 In all, the Court finds that Allah's placement in Administrative Segregation as a pretrial

detainee was continued punishment for the 2009 incident and was not a response to concerns of

facility safety or security, or to address a threat Allah presented as a pretrial detainee.  As such,

the plaintiff's substantive due process rights were violated.  To be clear, this is not to say that a

pretrial detainee can never be placed on a restrictive status.  What is problematic here is that there was no individual determination that the restraints and conditions of Administrative Segregation were reasonably related to, and not excessive in light of, concerns about placing Allah in the general population.

### 2. Procedural Due Process

The plaintiff also contends that the defendants violated his right to procedural due process in deciding to continue his Administrative Segregation status.  Again, the Court agrees. The defendants' failure to provide the plaintiff with adequate procedural protections when he came into DOC custody as a pretrial detainee in the fall of 2010 violated his constitutional rights.

Courts look to the purpose of the restraint or condition of confinement when determining the due process protections to which a pretrial detainee is entitled.  When a restraint or condition is imposed for disciplinary or punitive reasons, the pretrial detainee is entitled to the protections set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974).  *See Benjamin v. Fraser*, 264 F.3d 175, 189-190 (2d Cir. 2001).  "The *Wolff* Court, while holding that full adversary proceedings are not required for disciplinary deprivations of liberty in the prison setting, required written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence."  *Id.* at 189 (citing *Wolff* at 561-570).  In contrast, when the purpose of the restraint is administrative, the less-stringent procedures set forth in *Hewitt v. Helms,* 459 U.S. 460 (1983) are due.  *Id.* at 189-190.  Pursuant to *Hewitt,* an inmate "must merely receive some notice of the charges against him and an opportunity to present his views." *Hewitt,* 459 U.S. at 476.  Here, because the Court has found that the plaintiff's placement in Administrative Segregation as a pretrial detainee was punitive, the protections afforded by *Wolff* were required.  *See Friedland*, 2014 WL 1247992, at *4 ("The

Court of Appeals for the Second Circuit has held that a pretrial detainee who has been subjected to disciplinary sanctions or punitive restraints is entitled to the due process protections set forth in *Wolff*.") (citing *Benjamin,* 264 F.3d at 190).

The defendants, in their post-trial brief, claim that the plaintiff stipulated at trial that he was not challenging the procedure at the September 2010 hearing. The Court has reviewed the relevant portion of the transcript. Counsel for Plaintiff stated, "we'll stipulate there's not a problem with the procedure that was done. It was the outcome and what was considered that was the problem. The notice and stuff like that, that's not an issue." The language challenging "what was considered" during the hearing process *is* a challenge to procedural due process. What the plaintiff is challenging – the meaningfulness of the process – is precisely what the Court finds as deficient. Under basic principles of due process, a pretrial detainee is entitled to "meaningful" process. *See Mathews v. Eldridge,* 424 U.S. 319, 333 (1976). What the plaintiff alleges here is that, while he was provided in the technical sense notice and a hearing, the entire process amounted to no more than a sham. The Court agrees.

DOC officials provided only the semblance of process to Allah. He received a timely Notification of Hearing form, was offered an advocate and the opportunity to present witnesses, had a hearing, and thereafter received a hearing report. A close examination of what actually transpired during this process, however, reveals constitutional deficiency.

Under *Wolff*, an inmate is entitled to written notice of the charges against him. Notice must be "something more than a mere formality." *Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001). Notice must "inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Id.* at 192-93. The Notification of Hearing Allah received stated the reason

for the hearing as follows:  "You were placed on A/S on 02/08/10.  Since that time you discharged and returned to the DOC without completing the program."  This language does nothing to indicate to the plaintiff what the hearing would be about to enable him to prepare a defense.  For notice to be sufficient, it is required to "inform the [inmate] of more specific facts underlying the allegation."  *Id.* at 193.  The defendants provided Allah with no specific facts as to why Administrative Segregation may be warranted in his particular circumstance.  In fact, the wording of the notice strongly suggests that the hearing was a mere formality and that the decision to continue him in Administrative Segregation had already been made.  The description of the hearing confirms this.  Defendant Griggs testified that at the hearing, which lasted approximately eight to ten minutes, he "explained the appeal process, why [Allah is] being reviewed because he's, you know, discharged on AS status…also explain the appeal process more in-depth."  There is no indication that any meaningful process was provided; instead, the evidence shows that the defendants did not consider or give Allah notice of anything he had done to warrant restrictive placement.

*Wolff* also requires that an inmate be provided with a written statement of the reasons for the action taken.  Here, the hearing decision states the following placement rationale: "According to the DOC Classification Manual, any inmate who discharges while on Administrative Segregation (A/S) shall be re-admitted at that status.  I/M Allah was placed on A/S on 02/08/10.  Since that time he discharged and returned to the DOC without completing the program."  The stated reason for the recommendation was as follows: "Inmate Allah did not complete the program, (sic) therefore he needs to continue in Administrative Segregation placement to complete program requirements prior to being placed in the general population."  Again, a semblance of process was provided, but it was not meaningful.  A pretrial detainee has

"a due process right to a written statement describing the evidence upon which a hearing officer relied in finding the detainee guilty of a disciplinary infraction." *Friedland*, 2014 WL 1247992, at *8. While the plaintiff did receive a report of the placement decision, the report does not state "the evidence relied on and reasons for the disciplinary action, as required by *Wolff*." *Jermosen v. Smith*, No. CIV-81-1037E, 1990 WL 154792, at *3 (W.D.N.Y. Sept. 28, 1990) (finding that a report lacking a statement of the evidence relied upon and the reasons for the disciplinary action violated due process). Allah was not provided with any specific reasons for the placement beyond a constitutionally problematic policy when applied to pretrial detainees. He was merely told he needed to complete the program, but was not given reasons why this placement was appropriate for him as a pretrial detainee. Again, the explanation Allah received indicates the entire process was spurious with the outcome predetermined.

A perfunctory hearing, held as a mere formality, where the final outcome was essentially automatic, does not comport with the guarantees of due process. Here, there was no allegation the plaintiff broke any rules as a pretrial detainee, no particularized determination that he was a risk, and no factual review or any indication that discretion was used in making the decision to place him once again in Administrative Segregation. "[I]t is a bedrock requirement of due process that such hearing be held 'at a meaningful time and in a meaningful manner.'" *Taylor*, 238 F.3d at 193 (citing *Mathews,* 424 U.S. at 319). "A hearing is not 'meaningful' if a prisoner is given inadequate information about the basis of the charges against him." *Id.* Further, due process is not satisfied when the hearing process is "a sham; the reviews must be meaningful and not simply perfunctory." *McClary v. Kelly*, 4 F. Supp. 2d 195, 212-213 (W.D.N.Y. 1998) (finding that periodic reviews of an inmate's placement in administrative segregation must amount to more than a sham).

The defendants' failure to provide the plaintiff with adequate procedural protections when he came into DOC custody as a pretrial detainee in 2010 violated his constitutional right to procedural due process.

### 3.   Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  An official is entitled to qualified immunity unless (1) the official violated a constitutional right of the plaintiff, and (2) the right was clearly established at the time of the constitutional violation.  *See Ashcroft v. al-Kidd*, 563 U.S. 731 (2011).

Under the first prong, as discussed supra, the defendants violated the plaintiff's substantive and procedural due process rights.  Under the second prong, a right is clearly established if, "at the time of the challenged conduct… 'every reasonable official would have understood that what he [was] doing violate[d] that right.'"  *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  There does not need to be a case "directly on point" in order for the right to be clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  "A broad general proposition" does not constitute a clearly established right. *See Reichle v. Howards,* 132 S.Ct. 2088, 2094 (2012).  Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson,* 483 U.S. at 640).

With respect to substantive due process, at the time of Allah's placement in administrative segregation as a pretrial detainee, it was clearly established that a pretrial

detainee's right to due process includes being "housed in a manner that is not punitive." *Osgood v. Amato*, No. 12-CV-565 TJM/CFH, 2013 WL 3777189, at *19 (N.D.N.Y. July 17, 2013). Likewise, it was clearly established that purposeless restrictions or conditions of confinement can constitute impermissible punishment when imposed on pretrial detainees. *See Bell,* 441 U.S. at 535 ("[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment."); *Benjamin,* 343 F.3d at 50 ("[U]nder the Due Process Clause, [a pretrial detainee] may not be punished in any manner—neither cruelly and unusually or otherwise.... Accordingly, courts considering challenges by pretrial detainees must initially consider whether the challenged conditions are punitive.") (citations omitted). It certainly should have been clear to the defendants that Allah, who as a pretrial detainee had done nothing to warrant it, could not be placed on a restrictive housing status with conditions amounting to punishment.

Turning to procedural due process, it was also clearly established at the time that "the requirements in *Wolff* applied to the disciplinary hearing of a pretrial detainee involving punitive sanctions or restraints." *See Friedland*, 2014 WL 1247992, at *16; *see also Osgood*, 2013 WL 3777189, at *19 ("the right of a pretrial detainee to a heightened level of due process given punitive restrictions" is clearly established.). In addition, it was clearly established that the process provided "be 'meaningful' and not a sham or a fraud." *McClary v. Coughlin*, 87 F. Supp. 2d 205, 214 (W.D.N.Y. 2000) *aff'd sub nom. McClary v. Kelly*, 237 F.3d 185 (2d Cir. 2001) (citing *Mathews v. Eldridge,* 424 U.S. at 333).

In their post-trial brief, the defendants argue that they are entitled to qualified immunity because it was not clearly established that an inmate possessed a liberty interest in avoiding placement in Administrative Segregation. There are two glaring deficiencies with this argument.

26

First, it suggests that the plaintiff does not have a protected liberty interest triggering a right to procedural due process under *Sandin v. Conner*, 515 U.S. 472 (1995). *Sandin*, however, "does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process." *Iqbal*, 490 F.3d at 163, *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Second, the defendants' argument ignores the Second Circuit caselaw outlined above which finds that the rights at issue here were clearly established in 2010. Accordingly, the Court finds that the defendants are not entitled to qualified immunity in this case.

### 4. Damages

Section 1983 creates "a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305-306 (1986) (citing *Carey v. Piphus,* 435 U.S. 247, 253 (1978)). Damages for constitutional violations are thus "ordinarily determined according to principles derived from the common law of torts." *Id.* at 306. Among the types of damages available under Section 1983 are damages to compensate a person for injury caused by the constitutional deprivation. This type of damages – compensatory damages – is awarded when there is proof of actual injury. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992). Compensatory damages "may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation ... personal humiliation, and mental anguish and suffering." *Stachura*, 477 U.S. at 307.

In this case, the plaintiff was subjected to heightened conditions of confinement in violation of his substantive due process rights. He was placed in a program with restrictions and

conditions amounting to punishment, and the defendants' proffered reason for the placement was

not reasonably related to, and was excessive in light of it.  As a result, the plaintiff suffered

physical harm: he testified as to the incident where he fell in the shower because he was made to

shower with leg irons on; he also testified as to his difficulties sleeping and his weight loss as a

result of the unconstitutional placement.  Allah testified extensively about his psychological

harm, and the Court finds his testimony reliable.  His familial relations, his interpersonal skills,

and his overall perception of the world were profoundly altered by the time he spent in solitary

confinement and by being housed at Northern in close quarters with inmates who are among the

most dangerous in the state.  Moreover, as explained in detail above, Allah lost numerous

privileges as a result of being held in Administrative Segregation for 358 days as opposed to in

the general prison population.[5]  Those deprivations took a toll.

     In such a situation there is no magic formula for determining compensatory damages.

Courts addressing situations of wrongful confinement have "compar[ed] the conditions of the

general prison population with those of isolation ... or [have assessed] the emotional distress that

plaintiff has suffered from such punishment."  *Nolley v. Cty. of Erie*, 802 F. Supp. 898, 907

(W.D.N.Y. 1992) (citing *Patterson v. Coughlin,* 722 F.Supp. 9, 11 (W.D.N.Y.1989), *aff'd in part

and vacated in part,* 905 F.2d 564 (2d Cir. 1990).  In *Nolley*, more than twenty-five years ago,

the plaintiff was awarded $125 per day for each of the 310 days she was wrongfully confined in

---

[5] Allah was officially placed in Administrative Segregation on October 4, 2010 and pleaded guilty to the charges pending against him on September 26, 2011.  The plaintiff was placed in Administrative Detention on September 17, 2010, but as the evidence at trial did not show that this placement was unconstitutional, the Court will not factor that time into the damages calculation.  In addition, although Allah was offered the opportunity to progress to Phase II in December 2010 and refused to consent to progression, the Court will not modify the damages calculation to account for the plaintiff's failure to consent to an unconstitutional placement. Finally, the plaintiff asks that the Court add an additional five days to account for his inability to earn good time credit while in Administrative Segregation.  Because there was insufficient evidence as to this issue at trial, the Court will not add the additional time.

segregation (in which she was subjected to severe conditions giving rise to "psychological trauma.").  *Id.* at 908.  Other courts have adopted a similar approach in awarding damages for cases involving wrongful confinement:  *See, e.g.*, *McClary v. Coughlin*, 87 F. Supp. 2d at 221, *aff'd sub nom. McClary*, 237 F.3d 185 ($175 per day for each day unconstitutionally confined); *Smith v. Rowe*, 761 F.2d 360, 368 (7th Cir. 1985) ($119 per day of segregation).  Allah is entitled to damages that will fairly compensate him for his unconstitutional placement in an environment much more restrictive than general population and for its impact upon him.  The Court sets the amount of such damages at $175 per day.  The rate cannot be detailed with scientific precision. It is, however, fair, just, and reasonable.  $175 per day for 358 days totals $62,650.00.

Punitive damages may be awarded in a Section 1983 case when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade,* 461 U.S. 30, 56 (1983). This standard is not met here.  The evidence shows that the defendants, though mistaken, were simply trying to fulfill their professional duties.  They all have admirable records of public service.  The Court will not make an award of punitive damages.

<u>**CONCLUSION**</u>

"There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff*, 418 U.S. at 555-556.  While the Court appreciates the extraordinary challenges the defendants, and all DOC staff, face in effectively running a prison, it also must ensure that constitutional guarantees are secured.

For the reasons discussed above, judgment will be entered in favor of the plaintiff jointly and severally against defendants Cahill, Griggs, and Milling in the amount of $62,650.00.  The plaintiff's counsel should submit his application for an award of attorney's fees pursuant to 42

U.S.C. § 1988 no later than thirty (30) days following the entry of Judgment.  The defendants

will have fourteen (14) days to respond to any such application and the plaintiff may reply within

seven (7) days thereafter.

      SO ORDERED, this  4th day of April, 2016, at Bridgeport, Connecticut.

                              */s/ William I. Garfinkel*
                              WILLIAM I. GARFINKEL
                              United States Magistrate Judge